**Dana Ray EDMONDS, Petitioner,**

v.

**John JABE, Warden, Greensville Correctional Center, Respondent.**

**Civ. A. No. 95–0065–R.**

United States District Court, W.D. Virginia, Roanoke Division.

Jan. 23, 1995.

Donald R. Lee, and Barbara Hartung, Barry A. Weinstein, Richmond, VA, for petitioner.

Thomas Bagwell, Office of Atty. Gen., Prisoner Litigation Div., Richmond, VA, for respondent.

## MEMORANDUM OPINION

TURK, District Judge.

This matter is before the court on the Petitioner's motions for stay of execution and writ of habeas corpus, challenging the validity of his capital murder conviction. 28 U.S.C. §§ 2251 and 2254. The Petitioner, Dana Ray Edmonds, is presently incarcerated at the Greensville Correctional Center under a sentence of death. Edmonds' execution is scheduled to be carried out at 9:00 p.m. on January 24, 1995.

A hearing was conducted before this court on Saturday, January 21, 1995, to address the Petitioner's motions. At that hearing, counsel for both sides appeared and presented oral argument. Having thoughtfully considered their arguments, as well as the parties' pleadings, the record, and the pertinent case law, the court finds that the Petitioner's motions must be denied. While the court believes that the Petitioner's trial was constitutionally infirm, it does not believe those errors materially affected his conviction or death sentence.

### Procedural History

In the ten years since Edmonds was convicted, his case has undergone exhaustive scrutiny in both the state and federal court systems. In total, he has filed four post-conviction petitions questioning the validity of his present incarceration. Nevertheless, "any capital case is a matter of utmost gravity and, even in the eleventh hour, a court must once again assure itself that no fundamental miscarriage of justice is taking place." *Peterson v. Murray*, 949 F.2d 704, 705 (4th Cir.1991). With this in mind, the following is a summary of the case's procedural history.

On November 17, 1983, the Circuit Court of the City of Danville, sitting without a jury, convicted Edmonds of capital murder in the commission of a robbery. The conviction was based on the brutal slaying of a local Danville grocer, John Elliot.

The trial court conducted two separate hearings in the sentencing phase of Edmonds' trial. On December 12, 1983, the Circuit Court sentenced Edmonds to death. As aggravating factors warranting the sentence, the Court found that the victim's murder constituted an aggravated battery due to the vileness of the manner in which it was performed and that Edmonds represented a future danger to the public. This sentence was vacated on January 3, 1984, because it had been issued without the benefit of a pre-sentencing report. *See* Va.Code § 19.2–264.5. On May 4, 1984, the trial court, having reviewed a probation officer's recommen-

dations, resentenced Edmonds to the death penalty.

Thereafter, Edmonds appealed both his conviction and death sentence. The trial court was affirmed by the Virginia Supreme Court on April 26, 1985. *Edmonds v. Commonwealth*, 229 Va. 303, 329 S.E.2d 807 (1985). In its decision, the appellate court expressly found that the trial judge had been correct in finding both statutory aggravating factors. *Id.*, 329 S.E.2d at 813–14. On November 4, 1985, the United States Supreme Court denied Edmonds' request for a writ of certiorari. *Edmonds v. Virginia*, 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985).

On March 25, 1986, Edmonds filed his first state habeas petition in the Circuit Court for the City of Danville, claiming that his death sentence violated both the Virginia and United States constitutions. The petition was denied by the Circuit Court on August 4, 1987. The Virginia Supreme Court denied Edmonds leave to appeal the Circuit Court's decision on June 17, 1988 and denied Edmonds' subsequent petition to reconsider on September 23, 1988.

On November 29, 1988, Edmonds filed a second state habeas petition with the Virginia Supreme Court, claiming that his execution would constitute cruel and unusual punishment due to his diminished mental capacity.[1] The Virginia Supreme Court denied the second state habeas petition, stating that it was procedurally barred under Virginia Code § 8.01–654(B)(2) and the rule of law annunciated in *Slayton v. Parrigan*, 215 Va. 27, 205 S.E.2d 680 (1974).

On August 18, 1989, Edmonds initiated the federal post-conviction process by filing a petition for writ of habeas corpus with this federal district court. The matter was set for an evidentiary hearing to address whether or not Edmonds' trial attorney had been ineffective for failing to ask the trial judge to recuse himself after Edmonds' initial sentencing. Agreeing with the United States Magistrate Judge's conclusion that Edmonds had been denied effective assistance of coun-

---

1. At the time of his trial, Edmonds was 21 and ranked in the lowest 3.6 percentile on standard intelligence tests.

sel, this court granted the petition on August 31, 1992, vacating Edmonds' death sentence and ordering resentencing to be conducted.

The Commonwealth appealed this decision to the United States Court of Appeals for the Fourth Circuit. On February 16, 1994, the Fourth Circuit reversed this court's decision to grant habeas relief. *Edmonds v. Thompson*, No. 92–401, 1994 WL 47745 (4th Cir. Feb. 16, 1994). The Court of Appeals based its reversal on a finding that Edmonds had failed to properly present the recusal issue in his petition. Edmonds again petitioned for writ of certiorari, but the petition was denied by the United States Supreme Court on October 3, 1994. *Edmonds v. Thompson*, —— U.S. ——, 115 S.Ct. 149, 130 L.Ed.2d 88 (1994).

The final step in Edmonds' post-conviction process was initiated on January 11, 1995, when he filed a petition for writ of habeas corpus with the Supreme Court of Virginia. That petition included the same claims herein raised. On January 18, 1995, the Court dismissed the petition without discussion other than a reference to Virginia's procedural default statute.

2. A complete recitation of the facts relating to the murder was presented by the Supreme Court of Virginia in its decision affirming Edmonds' conviction on direct appeal. *Edmonds v. Commonwealth*, 229 Va. 303, 305–308, 329 S.E.2d 807, 809–811 (1985). Accordingly, except to the degree necessary, this court will not revisit the factual background of the murder.

3. Conflicting affidavits have been submitted to the court with respect to when Edmonds learned of his trial counsel's dual representation. Edmonds' trial attorney states that, upon his appointment to represent Coles on October 26, 1983, he informed both Edmonds and Coles of the potential conflict and offered to withdraw if either party objected. He claims that neither party raised any objection or reservations with the joint representation. (Respondent's State Habeas Exhibit 1, Affidavit of trial attorney at paragraphs 4–9). By contrast, the Petitioner states that he learned of the conflict for the first time in November of 1994 and that if he had known his attorney was representing Coles, he would have asked the trial court to appoint him new counsel. (Pet'r Ex. G at para. 1).

4. The following is the shortened chronology of the Coles and Edmonds cases, as set forth in the Petitioner's brief in support.

*Factual Background* [2]

The claims brought in the present petition deal with an alleged conflict of interest under which Edmonds claims his trial attorney was operating. According to Edmonds, this conflict violated his 6th Amendment right to effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). In addition, he believes that, but for the conflict, he would not have been eligible for the death penalty. *Sawyer v. Whitley*, —— U.S. ——, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). The Petitioner claims that he learned of this conflict for the first time in November of 1994, when his present habeas counsel investigated the background of Edmonds' former girlfriend and prosecution witness, Laverne Coles. (Pet'r Br. in Supp. at 29 n. 9).[3]

The investigation revealed that Edmonds' trial attorney had been representing Coles on an assault charge during the same period in which she testified for the Commonwealth against Edmonds.[4] This conflict, Edmonds contends, was known not only by his own attorney, but also by the prosecution and the trial judge.[5] Nevertheless, in direct derelic-

7/22/83  Murder of Elliot
7/23/83  Arrest of Edmonds: **Edmonds gets court-appointed attorney on or about this date**
10/23/83 Assault on child by Coles
10/26/83 Criminal complaint and arrest warrant for Coles: **Edmonds' attorney begins representing Coles**
11/15/83 **Edmonds' trial begins**
11/16/83 **Coles testifies at guilt phase of Edmonds' trial**
11/17/83 Edmonds found guilty
11/18/83 Edmonds' sentencing begins
12/08/83 **Coles appears in front of Edmonds trial judge**
12/12/83 Edmonds' initial death sentence
1/19/84  **Coles' bench trial in front of Edmonds' trial judge**
1/20/84  Second sentencing hearing for Edmonds
5/04/84  **Death sentence imposed on Edmonds for a second time**
6/04/84  Coles sentenced by Edmonds' trial judge

5. The assertion that the prosecution and the trial judge were aware of the conflict is based primarily on the timing of Coles' and Edmonds' cases. The two cases were before the same trial judge during a six month period from January 1984 through June 1984. It should be noted that, while the Danville Commonwealth's Attorney's

tion of their ethical duties and the 6th Amendment rights of the Petitioner, Edmonds maintains none of the parties ever revealed the conflict. *See Holloway v. Arkansas*, 435 U.S. 475, 485, 98 S.Ct. 1173, 1179, 55 L.Ed.2d 426 (1978) (defense counsel's duty to disclose conflict); *Virginia Code of Professional Responsibility*, DR 5–105(B); *United States v. Tatum*, 943 F.2d 370, 379–80 (4th Cir.1991) (prosecution's duty to reveal conflict); *Cuyler*, 446 U.S. at 347, 100 S.Ct. at 1717 (trial court's duty to conduct an inquiry when it *knows or should know* conflict exists).

· Furthermore, the Petitioner contends that his attorney's conflict adversely affected him in both the guilt and sentencing phases of his trial. With respect to the guilt stage, Edmonds contends that the conflict prevented his attorney from aggressively cross-examining Coles after she had presented damaging testimony.[6] On cross, Edmonds' attorney asked Coles if she had ever been committed to a mental institution. She replied that she had voluntarily admitted herself on three occasions and that she had been an outpatient at the Danville Mental Institution, where she had received counseling twice a month since 1977.

However, as the Petitioner notes, his trial counsel made no inquiry into the nature of Coles' illness and asked no questions about her criminal record. Edmonds asserts that a competent cross examination into these areas would have undermined Coles' credibility because, she had been diagnosed as a paranoid schizophrenic who was prone to abusive behavior and delusions. Moreover, Coles had the pending assault charge and at least two convictions for battery.[7]

With respect to the sentencing stage, Edmonds believes the conflict resulted in his trial attorney's decision not to call Coles as a witness. Edmonds argues that this decision, in turn, led to the trial court's finding of future dangerousness and the eventual imposition of his death sentence. Edmonds' criminal record at the time of his second sentencing included five misdemeanor convictions for assault and battery.[8] Of those five, three were based on charges brought by Laverne Coles. Edmonds believes that if Coles had been called at sentencing, his counsel could have challenged the three assault convictions on the grounds that Coles had either fabricated those incidents or had instigated them by assaulting Edmonds. By not putting Coles on the stand at sentencing, Edmonds argues, his counsel assured that Edmonds' assault convictions would be reviewed by the trial judge without any substantive or mitigating explanation.

Based on these facts, Edmonds believes there is a powerful constitutional basis for vacating his conviction and sentence.

### Analysis

When a prisoner fails to comply with state procedural rules, federal habeas jurisdiction is severely limited. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). The narrow window for collateral review is available only if the petitioner shows cause for the default and actual prejudice therefrom or demonstrates that the federal court's failure to consider his claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991); *McCleskey v.*

---

Office handled both prosecutions, they were not handled by the same attorney.

**6.** Edmonds' trial began on November 11, 1983. On the second day of the trial, Laverne Coles, Edmonds' ex-girlfriend, was called by the Commonwealth to testify. During her testimony, Coles stated that on the day of the murder she had noticed Edmonds was upset and asked him what was wrong. According to Coles, Edmonds responded, "Baby, do you know how serious a murder charge is?" (Pet'r Br. in Supp. at Appendix Ex. F); (Tr. 194–95). The Petitioner contends that this testimony is arguably an admis-

sion of guilt and conflicted with Edmonds' statement to the police that he had acted in self-defense. (Pet'r Br. in Supp. at 30).

**7.** The pending assault charge, for which Edmonds' attorney was representing Coles, dealt with an attack on her ten year old son with a belt, requiring fourteen stitches to his hand.

**8.** In total, Edmonds' record reveals sixteen convictions. Three are for felonies based on theft charges (burglary, statutory burglary and grand larceny). The remaining thirteen are misdemeanor convictions.

*Zant,* 499 U.S. 467, 494, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991); *Murray v. Carrier,* 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2649–50, 91 L.Ed.2d 397 (1986); *Engle v. Isaac,* 456 U.S. 107, 135, 102 S.Ct. 1558, 1575–76, 71 L.Ed.2d 783 (1982). This limitation on federal review of defaulted claims promotes comity between federal and state courts and prevents federal habeas from being used as a tool for circumventing the state trial and appellate processes. *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); *Slayton v. Parrigan, supra.*

Thus, the initial inquiry is whether or not Edmonds' present claims have been defaulted barring a review on the merits by this court. Edmonds' most recent state habeas petition was denied by the Virginia Supreme Court without discussion.[9] The Court did, however, reference the Commonwealth's procedural default rule. § 8.01–654(B)(2). Based on this bare statutory citation, the Respondent argues that a presumption of correctness must be given to the findings of fact necessarily relied on by the state court. To wit, that Edmonds had knowledge of this claim prior to the filing of his previous petitions. *Stockton v. Murray,* 41 F.3d 920, 924–25 (4th Cir.1994); *Clanton v. Muncy,* 845 F.2d 1238, 1241 (4th Cir.1988). Further, the Respondent contends, in order for Edmonds to overcome the presumption, he must "establish by convincing evidence that the factual determination by the State court was erroneous." 28 U.S.C. § 2254(d).

■ While this is generally true, in the instant case, the court cannot agree. Having reviewed the Virginia Supreme Court's decision, the court believes that no findings of fact were made by that tribunal. Rather, without giving factual support for its conclusion that Edmonds' claims were defaulted, the Court simply recited verbatim the default rule's statutory language. This court is of the opinion that, in order for the presumption to arise, at least some factual reference to the trial record must be made by the state court. A close reading of 28 U.S.C. § 2254(d) and the case law in this area supports this position. *See Stockton,* 41 F.3d at 924–25 ("*Findings* of the state court *supporting its decision to apply the procedural bar* are given a presumption of correctness.") (emphasis added). Because the Virginia Supreme Court has provided no factual basis on which this court may analyze the application of the bar and because of the circumstances under which this case is being considered, the court believes a traditional cause and prejudice review of the Petitioner's case is required.[10]

■ In this case, the Petitioner claims that cause exists, as annunciated in *Wainwright v. Sykes* and its progeny, to excuse his failure to raise the conflict claim in previous state habeas petitions. According to Edmonds, there were "objective factors" external to his defense which impeded raising the claim at an earlier stage. *McCleskey,* 499 U.S. at 493, 111 S.Ct. at 1469–70. First, he states that "reasonable diligence" on the part of his former habeas counsel did not result in the discovery of the conflict.[11] *Id.* at 494, 111

9. The Virginia Supreme Court's decision, in its entirety, is provided below.

    Upon a Petition for Writ of Habeas Corpus
    On consideration of this case, the Court is of the opinion that the writ of habeas corpus should not issue on the grounds that no writ shall be granted on the basis of any allegation the facts of which the petitioner had knowledge at the time of filing any previous petition. Code § 8.01–654(B)(2). It is therefore ordered that the said petition be dismissed.

10. The court appreciates that, as a federal district court entertaining a habeas corpus petition, it does not sit as a court of appeals over a state supreme court. *Holloway v. Woodard,* 655 F.Supp. 1245, 1249 (W.D.N.C.1987). In this light, any review of the Virginia Supreme Court's application of its procedural default rule is done to ascertain *the merit of the Petitioner's claims that the rule was misapplied* rather than to placate this court's paternal instincts. Further, because meaningful state and federal appellate review is constitutionally required in a capital case, *Parker v. Dugger,* 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991), this court believes at least some explanation should be presented for why a death-row Petitioner's claims have been defaulted.

11. Importantly, this claim is not based on a theory that his former habeas counsel was negligent, but rather, that the conflict was not identifiable upon a reasonable inquiry into the trial record. *Coleman v. Thompson, supra,* (holding that the 6th Amendment does not entitle a prisoner to assistance of counsel on collateral attack and that therefor attorney error at the post-con-

S.Ct. at 1470. In addition, he believes that "interference by officials" occurred in this case preventing his awareness of the conflict, namely, the ethical breach of the trial attorney, judge, and prosecution in failing to put the conflict on the record. *Id.* ("Objective factors that constitute cause include 'interference by officials' ... and 'a showing that the factual ... basis for a claim was not reasonably available to counsel.'") (citation omitted).

Having reviewed the record and the arguments made by counsel, the court finds that the Petitioner has shown cause. The only mention of the conflict in the entire record is found in a single sentence buried in a psychiatric report prepared for the sentencing phase of Edmonds' trial. In that report, which was comprised of twenty pages of detailed analysis, is the sole clue that Edmonds' attorney also represented Laverne Coles.[12] Thus, it is understandable that Edmonds' previous habeas counsel were unable to recognize and raise this claim in an earlier petition. This is especially true considering the nature of the charges Edmonds faced. One would expect that, in a criminal case where the accused's life was at stake, any waiver of a conflict of interest would be fully explained on the record after an inquiry by the trial court. Since this was not done in the present case, there was no reason for Edmonds' former counsel even to consider the possibility that a conflict of interest may have existed.

■ Having concluded that the Petitioner has shown cause, the court now must examine whether Edmonds was prejudiced by the

conflict.[13] In order for prejudice to exist, Edmonds must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (emphasis in original); *Felton v. Barnett*, 912 F.2d 92 (4th Cir.1990).

The Petitioner contends that he was prejudiced at both the guilt and sentencing stages of his trial. The court does not agree. Little needs to be said about the effect the conflict had on Edmonds' conviction. Even if Edmonds had been appointed new counsel and refrained from waiving his right to a jury trial, the court is confident that he still would have been found guilty. There was overwhelming evidence at Edmonds' trial linking him to the felony murder of John Elliot. While Coles' testimony was not insignificant, neither was it the gravamen of the evidence presented by the prosecution. Further, the sufficiency of the evidence was upheld by the Virginia Supreme Court on direct appeal and by this court on Edmonds' initial habeas petition.

Similarly, the court believes the conflict did not affect the trial judge's eventual decision to impose the death penalty. Edmonds argues that he was prejudiced because his criminal record was reviewed by the trial judge without the knowledge that three of his assault convictions were based on charges brought by Coles. He believes that if the trial judge had been made aware of this, he

---

viction stage can never amount to constitutionally ineffective assistance of counsel excusing procedural default).

**12.** The following is the relevant portion of the report.

"[Edmonds] indicated that at present, Ms. Cole [sic] is in the Danville City Jail for 'beating her kids.' [Edmonds] stated that she had beaten three of her four children. *[Edmonds' attorney], who is also Ms. Cole's attorney* corrected the story indicating that the altercation occurred only with her oldest boy...." (Pet'r Br. in Supp. Appendix at Ex. T p. 7). (emphasis added).

**13.** It should be noted that the prejudice required to avoid procedural default on collateral review is not the same as on direct appeal. The case law cited by the Petitioner for the proposition that an actual conflict of interest is considered per se prejudice does not apply to the former. *Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942) ("The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of the prejudice arising from its denial."). *Compare United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1595–96, 71 L.Ed.2d 816 (1982); *Felton v. Barnett*, 912 F.2d 92 (4th Cir.1990).

would not have reached his future dangerousness determination.[14]

This argument, however, ignores the fact that the trial judge's imposition of the death penalty was based, not only on future dangerousness, but also, on the vileness of the manner in which the murder was performed.[15] The vileness finding was expressly affirmed by the Virginia Supreme Court, as well as by this court and the Fourth Circuit on Edmonds' initial federal habeas petition.[16] Therefore, even if Coles' testifying at the sentencing phase of the trial would have caused the judge to reach a different result as to future dangerousness, it would not have altered the sentence which the Petitioner received.[17] Va.Code §§ 19.2–264.2 and 19.2–264.4(c); *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Watkins v. Murray*, 998 F.2d 1011, unpublished opinion, 1993 WL 243692 at *9 n. 5 (4th Cir. July 7, 1993) (alleged constitutional error which would invalidate a finding of future dangerousness found immaterial to the imposition of death sentence because vileness factor also found); *Briley v. Bass*, 742 F.2d 155, 166 (4th

Cir.1984) ("Since it is clear that there was evidence to sustain the 'dangerousness' finding and that the instruction on such a ground was not open to attack, it is unimportant whether the instructions on 'vileness' were strictly correct.")

■ Since prejudice has not be shown, the only way in which the Petitioner's claims can be reviewed on the merits by this court is if Edmonds can demonstrate that a failure to do so would result in "miscarriage of justice". The Petitioner argues that he qualifies under the exception because he is "actually innocent" of the death penalty. In order to prevail on his claim of actual innocence, Edmonds must show "by clear and convincing evidence that but for a constitutional error, no reasonable [trier of fact] would have found [him] eligible for the death penalty under the applicable state law." *Sawyer*, —— U.S. at ——, 112 S.Ct. at 2515; *Spencer v. Murray*, 18 F.3d 229, 236 (4th Cir.1994). Based on what has already been said about the lack of prejudice at the sentencing stage of Ed-

14. In support of this theory, the Petitioner notes the testimony of his trial attorney given at the evidentiary hearing conducted by this court on the Petitioner's first federal habeas petition. During that hearing, the attorney related a conversation he remembered having with Edmonds' trial judge after his initial sentencing hearing:

Well, it was my opinion that [the judge], that that [sic] testimony had surprised—In fact, [the judge] specifically said that the testimony just shocked him, had obviously caused him a great deal of concern. [The state's expert] had testified that in his opinion Mr. Edmonds, there was a high probability of Mr. Edmonds' future dangerousness. [sic]

And, at that point, I felt that that was the linchpin upon which [the judge] had essentially made his decision, and if there was a way in which I could undermine or refute that testimony, that there was sufficient other evidence that [the judge] would not, at that point, choose the death alternative. (Tr. 35, 42 Ex. S).

15. Even if it could be said that future dangerousness was the sole basis for Edmonds' death sentence, it is not at all clear that the trial judge based his finding strictly on the Petitioner's criminal record. As the Respondent correctly notes, the state's expert testified, during a habeas hearing, that even if Edmonds' prior convictions were not considered, he still would have concluded

that Edmonds represented a continuing serious threat to society. (Resp. ex. F) ("If one eliminates the entire past history of criminal activities and relies on other information such as the crime of which he has been convicted, the use of drugs, the not working, I would still reach a conclusion that there was a probability of the defendant committing criminal acts of violence which would constitute a continuing serious threat to society, but the degree of probability would be not as high as it was given the past criminal activity. But there would still be an above the normal range.")

In addition, the Petitioner's theory assumes that once the trial judge was made aware of the role Coles played in the three assault convictions, he would have totally disregarded them. This is an assumption which the court believes is, at best, tenuous.

16. The Petitioner's contention that the trial judge's decision was based only on the future dangerousness statutory factor is frivolous. *See Edmonds v. Thompson*, No. 92–4011 at 4 n. 2, 1994 WL 47745 at *2–3 n. 2 (4th Cir. Feb. 16, 1994).

17. The court is also unpersuaded by the Petitioner's assertion that the entire sentencing phase was tainted when Coles was not called to testify. *See Sawyer v. Whitley*, —— U.S. at ——, 112 S.Ct. at 2523.

monds trial, the court finds that Edmonds cannot meet this standard.[18]

### Conclusion

In closing, the court would like to make it clear that it believes Dana Ray Edmonds did not receive effective assistance of counsel. The court believed this to be the case when it granted habeas relief in August of 1992, and it is even more apparent to the court today. There cannot be a more blatant conflict of interest than the one that existed in the present case. Edmonds' attorney should never have accepted his appointment to represent Coles knowing that she was likely to testify against the Petitioner. Once he had done so, the court simply is at a loss to understand why neither he nor the prosecutor presented the issue to the trial court. Further, the court cannot fathom how any attorney defending a capital murder case could have believed that an unwritten waiver of such a severe conflict, given by one individual of admittedly low intelligence and another who was a diagnosed schizophrenic, could be legally and ethically sufficient.

Even more troubling to the court, Dana Ray Edmonds will suffer the Commonwealth's most severe penalty in less than thirty-six hours, despite the fact that the trial in which his death sentence was imposed was, unquestionably, marred by a clear violation of his 6th Amendment right to counsel. Wholly apart from the goal of attaining reliable determinations of guilt and innocence, our judicial system should operate in such a manner that defendants are assured of receiving their constitutional protections *before* the state exacts punishment for the violation of its laws.[19] It is the opinion of the court that the system failed to provide Mr. Edmonds these protections. As a result, this court was left to perform an arguably speculative examination *of what would have happened if Edmonds had received his constitutional right to conflict free representation.*

Nevertheless, bound by case precedent and the enigmatic doctrine of procedural default, the court must deny the Petitioner's motions for stay of execution and writ of habeas corpus. Edmonds' claim that his 6th Amendment rights were violated is procedurally barred from a collateral review on the merits.

---

18. While this court is tempted to accept the Petitioner's invitation to extend the "miscarriage of justice exception" beyond a situation in which actual innocence of a death sentence is claimed, it cannot ignore the trend in the most recent Supreme Court decisions to view the exception narrowly. *Sawyer*, —— U.S. at ——, 112 S.Ct. at 2525 (Blackmun, J., concurring) ("[A]n implicit premise underlying the Court's decision [is] that the only 'fundamental miscarriage of justice' in a capital proceeding that warrants redress is one where the petitioner can make out a claim of 'actual innocence.'"); *Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 *(1989)*; *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).

19. In the seminal case on 6th Amendment jurisprudence, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the Supreme Court recognized that our criminal justice system and our Constitution serve a greater purpose than simply the dependability of guilt determinations.

> From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him. *Id.* at 344, 83 S.Ct. at 796.